The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. Please be seated. Ms. Welch. Good afternoon, Your Honors. May it please the Court, Sarah Welch to the appellant. In the decision below, the District Court reinstated thousands of terminated federal probationary employees without a single employee participating in the case. Instead, the challenge to the agency's employment decisions came from states, who are strangers to the relationship between the federal government and its employees. The District Court lacked jurisdiction twice over to enter that relief. First, the states lacked standing to challenge the federal government's employment decisions. And second, challenges to federal employment decisions must be brought through the administrative CSRA process, Congress created or not at all. Show me where it says that the states have to file suit under the CSRA, in the CSRA. Sure, Your Honor. The CSRA's channeling provisions make clear which parties can bring challenges, on what basis, and what remedies they can seek. And the Supreme Court has made clear twice over in Fausto and Elgin that the implication from that is that Congress intended that anyone not provided a claim or a remedy in that process is precluded from challenging federal employment decisions outside that process. But where in the complaint? Because if you look at the complaint, the states, there's nothing in the complaint that says CSRA, the APA. So where, I'm confused as to why we're looking at the CSRA instead of the APA, which is in the complaint, since we're looking at the complaint. Sure, Your Honor. And the CSRA implicitly precludes APA challenges for the same reasons I was just talking about. Where does it say that? The APA provides that it permits actions only when not excluded by other statutes. And where does it say in the CSRA that it excludes the APA? The reason that the states' claims fall within the CSRA's implied preclusion of any actions not expressly permitted under the CSRA is because the states are challenging federal employment decisions. Are we dealing with an implied revocation of jurisdiction here? With the CSRA, there's no explicit revocation of jurisdiction in situations like this. Are we dealing with the CSRA with what is simply an implied revocation? That's right, Your Honor. The Supreme Court in Fausto and more recently in Elgin concluded that the evident implication of... Is the Supreme Court sympathetic to implied anything these days? The Supreme Court concluded that it was clear that Congress' purpose in the statute would be upset, would be set on its head if challenges could be brought outside the CSRA process. But if you look at Congress' general purpose, you have to ask how is the general purpose implemented? Sure, and this is the inference from the statutory structure that Congress created. That's a highly reticulated scheme that provides remedies for some parties and precludes remedies for other parties. Those decisions would have no effect if parties who aren't provided with remedies could simply proceed outside that process. As this Court has recognized and as the Federal Circuit and the Supreme Court have repeatedly recognized, both in the CSRA context... What about if that's the case, you're saying it's implied, how does that line up with Thunder Basin and Axion? Thunder Basin and Axion are reflections of this exact same principle. That when there's a comprehensive statutory scheme like the CSRA, actions that aren't provided for in that are not permitted to proceed. The threshold issue, before we get into the preliminary injunction question and the four winter factors and the CSRA, doesn't the issue of standing precede everything else? Isn't that the threshold issue that we have to come to grips with? There's all this discussion about who's likely to prevail on the merits. But the question we have to ask ourselves is, do we have jurisdiction to resolve the merits? So what I'm saying is I think that the standing issue and the jurisdictional issue... I mean the standing issue and the preliminary injunction issue and the four winter factors are separate and distinct. And if you have to take them sequentially, you would want to address the standing issue first. Is that correct? So we think that both standing and the CSRA channeling argument are jurisdictional. In Block, the Supreme Court set the implied jurisdictional preclusion analysis before it addressed the standing analysis. That's in the last footnote of Block. So we think they're both threshold jurisdictional questions. Well, I'm just saying that you agreed both of them, and you should, and you're certainly perfectly entitled to it. But I'm just talking about the way in which our inquiry should proceed. And if we decide that there's standing, then it would go into the winter factors. But if we decide that there's no standing, that would end the case. That's right, Your Honor. We certainly agree with that. And the court does need to resolve both of the threshold jurisdictional questions before it could proceed to analyze the underlying merits questions under winters. We agree with that. So as to standing, the states made clear in their red brief that they're pressing exclusively an informational injury theory of standing. Can you put the microphone a little bit closer? I want to make sure I hear what everybody has to say. Sure, Your Honor. Thank you. Thank you so much. The district court made clear as well that its decision rested exclusively on an informational injury theory, but that theory doesn't fit with the claims the states are pressing, which are challenges to the underlying federal employment actions as unlawful, and the remedy that the states are seeking, which is reinstatement of those employees with back pay. The states are not seeking notice and emphasizing that. They say in their red brief that even though they won below and got the remedy they asked for below, they say they still don't have the notice that they wanted. And that just underscores the lack of fit between the injury that the states are seeking. If we were to view the dismissal of the probationary employees as harsh or dislocated, is that something that we are entitled to weigh and consider? Or is the impact of the discharge on individuals, is that germane to the analysis here? So we do think it's important to keep in mind that the probationary employees are not parties to this case. They're not challengers in this case, and the probationary employees, Congress made the considered policy judgment to get them very limited bases to challenge their terminations. And so we think that is germane in the sense that Congress has limited what probationary employees can bring, and the probationary employees aren't participating here. So the asserted injuries in this case are to the states, and they're peripheral downstream consequences of the action that the states are challenging, which is the termination of the federal probationary employees. So the states are saying that they suffered harms in the form of increased costs in their rapid response activities because they had to begin those quickly, and they're saying that they will in the future suffer generalized loss of income tax revenue and increased burdens on social services programs. The district court didn't rely on the latter two as being too speculative and not associated with the harms that the states were asserting, and as for the first harm regarding the rapid response rollout costs, those harms are ones that occurred in the past when the states conducted that, and they're implicit in any rapid response rollout. Are there any downstream economic costs that would confer standing on the states? Are there any downstream economic costs from federal action that the states could cite to alleged standing, successfully alleged standing, or are we just categorically prohibited from considering downstream economic impacts? Your Honor, courts have consistently been very skeptical of states' attempts to raise those sorts of downstream generalized economic harms as a basis for standing to challenge federal actions, and that makes good sense because if that sort of state taxpayer standing could be sufficient, then states could challenge virtually any federal action. But what about the states' argument regarding having to process unexpectedly thousands of applications for unemployment, not having the manpower to do it, not having to move employees from different agencies to process the unemployment, the benefit that the employees are filing for, is that you don't consider that to be harm to the states? So courts have, again, been generally skeptical of those sorts of alleged injuries as being sufficient to support state standing for similar reasons. Again, that would be an essentially boundless theory of state standing that allows states to challenge virtually any federal action because virtually any federal action will have some of these sorts of peripheral costs on states. I would emphasize that even the district court didn't rely on that as a basis for concluding that the states have standing. An additional point is that that connection has little to do with the states' informational injury theory because they would have experienced a surge in unemployment claims regardless of whether they received the notice of compensation. But the difference is having the notice to prepare for it, and I think that is the issue, is having the notice to prepare for it within 60 days rather than a couple of days. So a couple of points on that. One, if the states would have taken the same actions regardless, I don't think that that's a theory of standing that can be tied to the notice. And two, even if it were tied to the notice, it would at most entitle the states to 60 days' worth of reinstatement. But what they've obtained instead is indefinite reinstatement of all of the employees lasting for until final judgment and perhaps beyond. So it's, again, just not tied to the injury that the states say they're asserting or the statutory right that they say they're trying to vindicate. And doesn't the standing, I mean, we don't talk about standing in a vacuum. We look at what claims they're asserting. So here, tell me how the standing has to be tied to injunctive release, right, standing to pursue an injunction. How does that tie into the injuries that are asserted here, the forward-looking standing? Yeah, that's exactly right, Your Honor. The states have to demonstrate standing for the claims that they're pressing and for the particular forms of release that they're seeking. And the states are assertedly seeking to vindicate a notice provision, but the release that they're seeking is reinstatement of the federal employees indefinitely, which looks much more like a challenge to the underlying federal employment actions and an attempt to vindicate the probationary employees' interests. And that brings us right back into our CSRA channeling argument, which is that these are exactly the sorts of claims that are at the core of what the CSRA channels through the MSPB process and then to federal circuit review as the exclusive court with jurisdiction over those determinations. So I think you're exactly right, Your Honor, that the standing needs to map onto exactly what the states are claiming and what they're asking for. And I think it's telling that in the state's complaint, I believe at pages 71 and 72 of the JA, they're not requesting notice there. And the states even conceded below at the preliminary injunction hearing that the information itself is beside the point at this point. So the states aren't seeking forms of release that are closely tied to the statutory provision that they say they're trying to vindicate. Well, if they had harm in the past and they were allowed to pursue damages against the federal government, they'd have standing to pursue that, right? That would be kind of like a Warren Act claim against a private entity, which I think your opponents brought up in their brief, that there's a statute that provides for a fine and, you know, saying we had to implement all of these changes really quickly and that imposed costs on the state. Or if there's a fine for a daily failure to provide notice. The question of standing for backward-looking injury would be different, right, if that were something that they could pursue against the federal government. That's right, Your Honor. The states need to show a concrete forward-looking harm, something they'll suffer in the future that's readily ascertainable, in order to have standing to pursue a preliminary injunction. And on the Warren Act point, we do think it's telling that the Warren Act specifically precludes states, specifically allows states to sue to enforce the notice provision, unlike the underlying provision here, and it specifically precludes states from seeking exactly the kind of preliminary injunction they're seeking here. And we think it would just be very odd if the states were allowed to seek greater remedies against the federal government than they're allowed to seek against private employers. That would just be the opposite of the typical inference that we would expect. Well, it appears, from my reading of the complaint, is that the state is not challenging the decisions, but challenging the notice provisions, and the notice provisions for going also, because we're talking about Maryland and other states, where the concern could be repetition of this happening again without the 60 days notice. I see my red light is on. I'm happy to continue answering or discuss that. So, Your Honor, to the extent the states are seeking to assert prospective harms based on fear of future reductions in force, that are actual reductions in force, we don't think there's evidence to support the idea that the states are likely to suffer a lack of notice from any possible future risks. So, to the extent that's what the states are trying to assert, we don't think that they have the evidentiary basis to assert that sort of standing. Thank you. Good afternoon, Your Honor. And may it please the Court, Caroline Van Zyl, Solicitor General for the District of Columbia, on behalf of Appalachian States. With me at Council Table is Julia Doyle, the Solicitor General of Maryland. We're here today because the federal government engaged in the unprecedented mass termination of 24,000 probationary employees without providing the statutorily required notice to the states. That lack of notice imposed heavy burdens on the states as we struggled to implement our rapid response programs without the requisite 60 days notice. But now you have a notice. Respectfully, Your Honor, we do not have the notice. We know that a number of probationary employees, a large number of probationary employees have been terminated by several agencies throughout the country, but notice isn't simply that a large number of employees are going to be terminated. We're entitled to specific information, including how many of those employees are being terminated at each agency, where they're being terminated, the relevant geographic area, and other information that would help us to implement our rapid response program. Let's say if your quarrel is one of notice, what is the relationship between that and the remedy here, which is the reinstatement of every single employee? I mean, what was ordered below was a reinstatement of every single employee based on an absence of notice, and that's a very broad remedial decree, is it not? I understand that, Judge Wilkinson, and I would like to make two points to that question. When we're talking about lack of notice, we're talking about two things. We're talking about information and time. Time is a somewhat critical element here, and we are still lacking both that information and that time. In terms of the remedy of reinstatement, I just want to be clear, we don't view this as going to the question of standing. That's about the scope of relief, but if we want to talk about the scope of relief, what the reinstatement does for us is it gives us that time back. It gives us the 60 days back so that we can implement our rapid response protocols if the federal government does, in fact, decide to reterminate these probationary employees. And in terms of whether the remedy here can be characterized as broad or narrow, look, we're not disputing that this places burdens on the federal government, but I would emphasize that Judge Breda's very careful order still gives the federal government the opportunity tomorrow to reinstitute these risks so long as it gives us notice. They could start the process tomorrow, give us the requisite information, and 60 days down the line they could do exactly what they want to do. The ball is very much in their court. So, again, we view this as a pause. A stay is how the judge below characterized it. Are we talking about a category of informational injury here? For purposes of standing, yes. We think that that's exactly the right word to use. Hasn't the court frowned upon the recognition of informational injury as the kind of concrete injury that would afford standing? Oh, not at all, Judge Wilkinson. I think informational injuries are still very well recognized. You look at the language in cases like TransUnion where they address, they're the United States allegation that informational harms were afoot there. In that case, they simply said that what was being complained of was not a lack of information, but improper formatting. Still, Justice Kavanaugh in that case cited with approval cases like Public Citizen, cases like FEC versus Aikens, core informational injury cases. And this court has said that when you have an informational injury that forms the basis of standing, you need two things. You need, one, an alleged lack of access to information, which we have here. That lack of information endures. And, two, some sort of adverse effect. And that kind of adverse effect, this court said in Dreher, should be the type of harm that Congress sought to prevent by requiring the disclosures. I would submit here that that category, that adverse injury tied to the harms Congress was trying to prevent, is here in spades. The harm that Congress was trying to prevent was very clearly harms to our rapid response programs. They found, and you'll see this all over the legislative history, that we needed at least two months to be able to effectively gear up these programs, make contact with employees, and help connect them to re-employment services. I hear your points, and I understand them. But the court has, I think, been somewhat skeptical of informational injury as a category of standing. And the court has also made the point, hasn't it, that even the statutory infraction would not necessarily provide the kind of concrete injury that is necessary for standing. And so the question I keep asking myself is, we can talk about informational injury, and we can talk about statutory injury and everything, but the injury here has to be concrete. And I have some innate sympathy for your position, because I do think that it's a hard thing to be abruptly terminated from one's job. And I get that point, and I respect it. The question I keep having is, where is the concrete injury? And I look primarily, and I think it's your biggest hurdle in this case. I think you have a number of equitable factors that work on your side of the case. If one got into the four winter factors or something such as that. But the threshold question for me, all I'm trying to do is follow what I think the Supreme Court leads. And the hardest case, I think, for you to overcome is United States v. Texas. Because there you had the claim that the states brought, and that the lax enforcement, immigration enforcement measures taken by the federal government, had imposed all sorts of major costs upon the states. And Justice Alito in the dissent indicated that he sets out these categories of costs. Costs to supervise criminal aliens, costs associated with criminal recidivism, costs of detaining juvenile offenders, health care costs for illegal aliens. And yet the Supreme Court says those downstream costs are not enough to establish a concrete injury for purposes of Article III standing. And then you read that Texas case, and there's all of this language about saying federal courts must remain mindful of bedrock Article III constraints in cases brought by states against an executive agency or officer. And that's my problem. I have a lot of sympathy for the abrupt individual dismissals, and I think that works hardship. But I am hung up on this United States v. Texas case. And it seems to me that this is awfully close, don't you think? Respectfully, Judge Wilkinson, I don't think it's awfully close. I don't expect you to agree with me. I'm happy to. I don't expect you to agree with me. I'm hoping to persuade you to come around to my point of view here. There are several points that I would make on United States v. Texas. First, that's a redressability case. That is a case where the court said that a third party has no judicially cognizable interest in the prosecution of another. The language that you're talking about comes from a somewhat equivocal footnote about how in certain circumstances, indirect effects on state revenues can become more attenuated. I'll grant you that that information is in there. That language is from a Supreme Court case. But I think that there are several other clues in that opinion that lead ineluctably to the result that in an informational injury case like this, that was a third party enforcement case. This is an informational injury case. That the teachings of footnote number three should not apply. So I point to two things. The first is footnote number two, which contrasts the situation in U.S. v. Texas with a situation where the plaintiff himself is an object of the action or inaction at issue. That's very much the position we're in when it comes to this notice provision. It speaks directly to us. There is no statute speaking directly to the states in that case. And it imposes direct burdens on us through the rapid response program. And there's one other textual clue that I would highlight as well. After the core discussion in the case, Justice Kavanaugh walks through step-by-step several areas of the law that are not implicated, that are not disturbed at all by the holding in the United States v. Texas. And he says expressly this at pages 681 through 682. Quote, the standing analysis might differ when Congress elevates de facto injuries to the status of legally cognizable injuries redressable by a federal court. And he cites to the Aikens case. He cites to an informational injury case. Basically to signal that this is not some huge change. Footnote number three, the rest of the opinion, it's not some huge change to how courts have thought about standing jurisprudence for decades. Rather, he emphasized again and again that the decision was narrow and simply maintained the jurisprudential status quo. Let me hear everything you're saying. And I hear you're telling me that there was no question of notice in the immigration context. And I get your point. And now let me try to persuade you of that. If we were to recognize your claim, would we not be allowing the states to assert major control over the composition of the federal workforce? And isn't there a very strong federal interest, a federal executive interest, in the composition of its own workforce? And if we admit, if we recognize your claim, are we permitting the states to have a degree of control over the composition of the federal workforce? Whereas we would never allow the federal government, I wouldn't think, to have that degree of control over the state workforce. There was a big debate over that in National League of Cities and later in Garza. But if we talk about our federal system, doesn't each level of government have control over its own workforce? Well, I acknowledge that principle, Your Honor. And, of course, the federal government does have leeway in terms of much of its hiring and firing practices. But there is also a core precept that it has to follow the law. Just as we have to follow anti-discrimination law that applies to the states, so, too, they have to follow the law that Congress set forth in terms of the notice requirement here. And I hear that you are perhaps worried a little bit about opening the door, about creating some sort of slippery slope here where the states can interfere with any and all federal government hiring policies or practices. That couldn't be farther from the case here. And, in fact, I think to resolve this case, the court could do it in a very narrow way. There's an express notice provision that expressly gives a right to the states for three categories of information for a total of 60 days. Now, we can't tell the federal government to hire entirely new employees that they've never hired before. We don't have that kind of authority. But I think what the district court was. But now you have the notice, and then the question becomes one of redressability. Does it not, since what you're asking for essentially is the notice, but do you have the notice at this point? So, two things, Your Honor. I want to be very emphatic. We do not have the notice. There are three categories of information to which we're entitled, including how many employees were terminated by each agency in each geographic area. To this day, we do not have that information. I didn't see that as a requested relief. In reading your complaint, I was reading with interest to see what relief you were seeking. It looked like the states were seeking reinstatement of all the employees who were fired. But I didn't see a request asking the government to specify the things that are actually required by the notice provision, the number of employees in each geographical area broken down by agency, et cetera. Was that relief you sought in this case? We did seek several categories of relief. I don't know that they necessarily neatly tracked the information in the statute. But there was a request for an injunction. If you just want a notice and you're here complaining about a lack of notice, why didn't you ask for an injunction to provide the notice? Well, we would be perfectly happy with an injunction that provided us specifically with those categories of information. At this point, I think the way that Judge Berdar put it was you don't need to call the fire department if there's no fire. So, in other words, because of his temporary restraining order and preliminary injunction rewinding us back to the status quo ante because these individuals are reemployed, at this point, the urgency of the notice isn't there. But the second they start being subject to termination again, the fire has started again. And we very much do need that information. And we need the time as well. We need it 60 days in advance. And so I think it's fairly read. Our complaint asks for all appropriate relief, including the relief that's available to us under the APA vacator phase and the like. So I do think that that's fairly encompassed in our complaint. The other thing I would say is that when you're looking at standing, you look at standing at the time that the complaint was filed. If the government wants to make a mootness argument, they're free to do so. I don't believe that they would be successful in arguing that this case is moot because, again, we neither have that information, nor do we have the 60-day clock that is running, which is another very important part of the right here. And just to emphasize why it's so important, why if these employees were suddenly, you know, at risk of termination in the near term again, why these harms would immediately befall the states, the second that that option potentially was on the table, I would just direct the court to JA 158-59, where the New York Department of Labor offers some very illuminating statistics. They say from January 21st to February 20th, they received 178 unemployment claims from federal employees. But in the week of February 21st to 27th, they received an additional 372 new claims. In other words, when we filed this complaint, there was a tsunami on the way in terms of the need for rapid response services, which do cost us time and money, and in terms of a whole sea of unemployment insurance claims that we then have to triage. Suppose we were to give you all of the notice that you say you should have been provided and the like. Is the remedy for that, is there still a redressability problem? I mean, is the remedy for that to still reinstate every single employee? I do believe that that's a viable remedy. So, could the remedy have been, give them the notice right now, and the second that they've got the notice, you only have to re-employ these individuals for 60 days? Possibly that could have been a remedy that the district court crafted. What it did instead, though, was, again, it put the ball in the government's court. The district court felt that the only way I can redress the absence of notice or what have you is by reinstating every employee. Now that, again, that has an equitable pull to it. But there seems to be a disconnect between the harm alleged and the remedy imposed. And the remedy seems much, the remedy has to be tailored to the violation. And here the remedy is very broad and much broader than the actual violation. And just as a basic matter of equity, that's a difficult proposition. I understand the concern, Your Honor. And I would just note, number one, that that's not really a standing question. I don't hear anyone to be saying that these harms are irredressable. That goes to the scope of the remedy that the district court instated here. And I would note that the government in its brief, you know, it has some gripes about the scope of the relief ordered here. But there's no alternative request to narrow that relief. They have made this an all or nothing proposition. They said, you know, vacate, reverse, or bust. So if they want a narrower remedy, they can certainly go to the district court in the first instance and ask for the remedy to be narrowed or to be altered. But, again, the district court did give them the flexibility tomorrow to give us the requisite information to institute this rift, to do it the right way. What happened here is, and, again, we're not disputing that there is a cost to the government for this remedy. But I think Judge Berdara got it exactly right when he said that the agencies cannot engage in far-reaching illegal activity and then complain that the remedy is too burdensome. They are the ones who terminated 24,000 employees in a single go. That harm was wrought on the states. We had no agency, no way to avoid that harm, no way to avoid the need. The assertion of equitable powers seems to be extraordinarily broad. But this is a case where the impact of the contested action falls heavily upon the employees. And it falls heavily upon the employees, and it falls heavily upon the employees' families. And it forces an abrupt change, of course, in many a career. And that's deeply unfortunate. But then I look at it, and I say this case is about the harm to the employees, and there are no employees in this case. The employees are not parties to the case, and yet they are the ones that suffer. And so I'm asking myself, if the Supreme Court is demanding concrete injury, the parties that suffer the injury should be the ones asking for redress. But the parties that suffer the injury are nowhere to be found. And the injury that they have suffered is, to me, seemingly a lot more personal and dislocated than the injury and the downstream cost to the estate. Why are there not, this case is all about employees. Where are the employees? So, I see my time has expired. May I respond?  I am very happy to respond. So, Your Honor, again, two points. One, the harms to the estates are also very real. They are very concrete. They are profound. And that's in part because these are our residents, but it's also in no small part. I get that. The harms to the estates are very real. But are not the harms to the estates very real? Any time federal regulations are changed, you could change, a change in Medicare reimbursement rates would be of a gigantic harm. Change in the individual disability statutes in terms of the federal aid that goes to the states. Medicaid, disability aid, many, many funded mandates could become unfunded mandates. There are all sorts of federal actions that are going to have downstream effects and costs on the states. And so, are we, where is the limiting principle to this? Why are your downstream costs any more significant than the downstream costs from Medicare revision, disability aid provision, Title I provision, Title I aids for education? All of those things would impose real costs. Where is the limiting principle to all of this? And are we just unleashing a flood of federal suits, state suits against the federal government? Do you see what I'm asking? I absolutely understand what you're asking, Judge Wilkinson. I think the limiting principle here is twofold. We're talking about an informational injury based on a statute that gives us an express right to information, the kinds of harms that you're imagining. I don't think we're in the context of a statute that says these states are expressly entitled to this bucket of information. So, what that does in terms of the standing analysis is, yes, it gives us a little more breathing room that wouldn't be present in a case where there's not an information forcing provision. But the limiting principle there, this court has said, is that the harm that we, the state, suffer has to be the type of harm that Congress sought to prevent by requiring the disclosure. I would think that that would be the whole congressional intent regarding the 60 days. I'm saying that there would not be some effect on the state, but we're going to give you 60 days under this rapid response. That would be the intent, the congressional intent here, right? That's exactly right, Your Honor. And I would note that Congress made this quite expressed in the relevant House report. It said, among other things, that a rapid response program cannot be effective unless program officials are made aware of plant closings and large layoffs as soon as possible. It said two to four months was the requisite period of time. It cited a study that says notice periods of only two or three weeks have a negligible effect on reducing the duration of unemployment of displaced workers and the harms on the states, whereas advance notice of as little as one month reduces the duration of unemployment among displaced workers by as much as 27%. So those are employees who are getting new jobs who are no longer deprived of wages, right? There are health care benefits on any of that. So that's exactly what Congress had in mind, and exactly the kind of chaos that it sought to avoid is the sort of chaos that is happening in our rapid response programs. And again, the notice is to be given to the division of the state that runs the rapid response program. There could not be a stronger connection. And just one last point on this informational injury issue. I would urge the court to look at FEC versus Aikens, to look at Public Citizen versus DOJ. These are the core informational injury precedents that the Supreme Court cites again and again and again in Texas in TransUnion. And there in Public Citizen, for example, Public Citizen was seeking some information on potential judicial candidates, potential candidates for the bench. And the concrete harm there that was enough was the desire to participate more effectively in the judicial selection process. That was enough. Here we've documented tens and hundreds of thousands of dollars in pocketbook harms, real chaos for our rapid response programs, which Congress has required us to stand up. They have made us the ones responding to unemployment crises like this, not the federal government, the state. We are the ones left holding the bags by statute. And that's exactly why they gave us this right to information. So to say that we don't have standing here based on this concrete deprivation of statutorily required information that is tied inextricably to statutory demands when a nonprofit has standing because they want to participate more effectively in the judicial selection process. Before you move off, I know your time has expired and you've only spoken about standing, but we did briefly talk about jurisdiction channeling with your friend on the other side. And I'm a little concerned about the possibility of conflicting decisions. It seems that Congress has created a scheme that channels all decisions about government employees through an agency administrative scheme. And if that scheme doesn't give an employee an opportunity to bring their claim, they have nowhere else to bring it. Same for unions, etc. Here, if employees can, and I think have, brought claims through that process, but the states are suing in court about those exact same employees. So it's not impossible to imagine a scenario where a district court says this employee was wrongfully terminated and must be reinstated because of a state lawsuit. But the agency says the opposite, or the MSPB says the opposite, and determines that that exact same employee was not wrongfully terminated and should not be reinstated. Is that, I mean, that seems like a real possibility of a conflict here. How does that factor into this channeling discussion we've been having? I'll grant you that as a possibility, Your Honor. But as Judge Wilkinson noted earlier, implied preclusion is heavily disfavored. And when you're undertaking... Well, I mean, to admit that that's a possibility seems like a big give. I mean, you've given up a lot there, I think, because Congress is trying to channel all decisions, all review, including judicial review of employment, federal government employee employment decisions through one... They were trying to channel all of that into one scheme. Now, you may be able to bring... And states may have a claim that under the ACA we can challenge lack of notice. But if we're looking at what's actually being adjudicated and the remedy that's being sought and being given, it's something that definitely belongs in the administrative scheme. So there's a disconnect there, I think, between, you know, yes, we don't infer things that aren't in statutes into them, but we still have to reconcile two existing statutes. Like, Congress created the APA, but it also created this highly articulated scheme where it wants all employment federal employee actions to be litigated. That is true. That is where Congress wants employee and union actions to be litigated. But under Thunder Basin, the relevant inquiry is whether plaintiff's claims are of the type Congress intended to be reviewed within the statutory structure. Our claims are about lack of notice that is owed to the states, not to employees, but to the states. So that's the relevant claim that we're looking at. That claim... So, like, what happens when the conflict happens? Well, in part, that is what the Supreme Court is for. If there is a conflict... So the Supreme Court would have to decide on an employee-by-employee basis? No, Your Honor. There's a conflict between the district court and the administrative scheme. So, like, John Doe has a circuit split on John Doe's employment. And, like, Jane Doe has a circuit split on her employment. And John Doe, too, has a circuit split on his employment. And Jane Doe, too, has a circuit split on her employment. I don't think that that's a possibility, Your Honor. But why not? You're claiming to represent all of them. No, we're not here claiming to represent the employees. We represent the states and primarily the state departments of labor that are impacted by this and who are the ones that are due notice. The only common question that I can think of between what an employee might bring in the MSPB in our case is whether this was a rift or not. Now, that's one element of our claim here. It's not the only element. We also need to show that 50 or more employees were rift in a given competitive area, that they were rift within our jurisdictions, that we didn't receive the required notice. So there are a number of elements to our claim which are unique to us and which the MSPB, as far as I'm aware, couldn't adjudicate. We ran a search of all MSPB cases to see if an employee has ever sought to vindicate a state's right to notice. And as far as we found, it never happened. This kind of claim is a claim that is unique to states, and it's not the kind of claim that's meant to be channeled. And I think, if I may, the way that implied jurisdictional preclusion works is there are basically three ways in which your case can be impliedly precluded. One is when there's channeling. When the claim is directed to an administrative agency, you go there and then eventually you get judicial review. That was the case in Thunder Basin and in Elgin. The second way that you can get to preclusion is if the relevant plaintiff has some express rights to review while others are implicitly withheld to that class of plaintiff. That's Fausto, for example. And then the third way preclusion can come into play is when the plaintiff has no statutory right at all. And that's the Block case, for example. We do not fit into any of those categories. The MSPB is not available to us. As far as I'm aware, there's only one right given to the states in the statutory scheme. It's a right to notice. And so there's no implication that can be drawn from you get this right but not that right. And certainly it's not the case that the statute affords us no rights. We're right there front and center when it comes to notice. And so I think you are... I mean, the whole statute is about employees. It's about, you know, how employees can be terminated, how they can be put on, you know, leave, these sorts of... It's all about employees and it's about keeping them employed. And there is a provision that provides notice to the states in which the employees, you know, resign to help them remain employed or get re-employed. And so, yes, there's a provision saying you have to give notice to the states, but it's not like this statutory scheme is all about the states. It's all about employees. Well, the remainder of the CSRA is this provision was added into the RIFT scheme with very much a focus on states. And I would just note that when we walk through the Thunder Basin analysis, the most important factor is whether meaningful judicial review is available. The court said recently in Axon, Congress rarely allows claims about agency action to escape effective judicial review. So if this court were to hold that jurisdiction is impliedly precluded here, it would be quite extraordinary. It would be to say that there's a statutory provision that gives us a right that essentially isn't worth the paper it's written on because there's nowhere that we can go to vindicate that very important right that has very real consequences for states, for their economies, and, yes, also for the employees. But states in this provision are front and center. One of the things we're concerned about here is redressability, which is an element of standing. Most of the attention is devoted to injury, but redressability is also very important. And when I brought up the matter earlier, you said, well, that's not a standing problem. That's a merits problem. But I'm not sure. But the question I have, you know, is what can we do? And the obvious answer would be, well, you were deprived of notice. You have notice. But the answer is, can we go so far as to require reinstatement of every single employee? And the redressability problem here does run up against the CSRA. It runs up against the notion that violations and remedies have to have a disconnect, that one cannot be vastly broader than the other. And it runs up against the notion also that the federal government would have a presumptive control over its own workforce. So the question at the end of the day is, what can I do? What can we do? And even if, as I do, have real sympathy for the way this hits on individuals, ordering massive reinstatements, giving the states this kind of control over the composition of the federal workforce, going beyond just the provision of notice to do these other things, there's a real question here of what the federal remedy could be that wouldn't really significantly damage the federal government's control over the composition of its own workforce. That's a practical problem that's going to confront, that lies right at the heart of the case. It just is. Plus the question of whether there are appropriate limiting principles, if we hold that these downstream costs are sufficient to confer standing. But between the redressability and remedial problems and between the problems that the Texas case poses, those are significant practical concerns that I have that get in the way of the equitable pull of your position. And your position does have a strong equitable pull. But I'm just not sure that it overcomes the practical of whether we can do anything to redress this whole problem. And the district court, it seems to me, wonderful district judge, but the remedy here was quite extraordinary. So, may I respond? Absolutely. So, on redressability, I agree 100%. That's an element of standing. The question is, is there anything that could remedy even part of our harms? We're still missing information. At a bare minimum, I think that gets us over the redressability hurdle. But I take the gravamen of your concern, Judge Wilkinson, to be with the scope of the remedy here, with the number of employees that were ordered to be reinstated. What I'm trying to say is there's a connection between the remedy and the redressability element of standing. I think that there may be. But I personally think of standing as being sort of a hurdle that you need to overcome to get through the courthouse door. And then at the end of the case, if one has determined that we succeed on the merits, then, yes, you do have to craft a remedy under Califano that is key to what our harms actually are. And in terms of the reinstatement of these employees, or, as Judge Bredar, I think, put it, the sort of vacatur of these decisions that triggered the mass termination of these employees, reinstatement is a typical remedy granted in employment cases. I mean, when these cases proceed before the MSPB, some of them, I understand, are purportedly class actions. At the back end, that may be a remedy that is imposed on the government. And that's not a problem. It is a big remedy. I grant you that. It is a big remedy. But, again, it's because it is because, in part, of the unprecedented breadth of the action that was taken here. We have a declaration from Tracy DiMartini, who's been in government and HR for 20 years. She says she's never seen anything like it. To her knowledge, there's never been anything like this in history. And so I think, yes, is this a large pill for the government to swallow? Okay. I get your point. I understand that you say that the violation is unprecedented and maybe the remedy is unprecedented.  We will let you go for 21 minutes over your time because your argument is so interesting. And also, you've done such a fine job with it. And I would like to ask my fine colleagues if they have further questions of you. Because if they do, we're here for as long as it takes. Thank you. Judge Benjamin, do you have some questions you'd like to ask? No. Judge Rushing? Thank you very much. We would ask that the court affirm. Thank you. Ms. Welch, you have some rebuttal time, and we'd be pleased to hear from you. Thank you, Your Honor. Just a few points. First, on standing, Judge Wilkinson, we agree with your reading of Quote Note 3 in Texas. We think that's key here, and we think the states are asserting the same kinds of peripheral harms that exist in any number of federal actions. That was a discretionary action, and I believe they were asking for the state to take additional. Here, they're just saying it's all in the statute. That was about immigration guidelines. Here, we have a statute. There, it was a request that we want to be able to do more, more than you're required to do. Here, they're saying we just ask you to do what you are required to do. So that's the difference between this case and the Texas case. Sure, Your Honor, and the commonality between this case and the Texas case is that the states are trying to rely on the same sorts of peripheral harms that they say are associated with a government action or a government inaction, and those sorts of peripheral harms would create a boundless theory of state standing that will permit them to challenge virtually any federal action. And I want to agree with my friend on the other side that Footnote 3 isn't a state change. It reflects courts' continued and longstanding skepticism toward this sort of boundless, peripheral, downstream injury theory of state standing. The Footnote 3 cites Florida v. Mellon, which dates back to 1927, and we've collected a number of similar decisions in our brief. Second, even if the states had an injury, setting aside the Texas point, the release they've requested is not tied to that injury. They admit that by saying they won below, and they still don't have the information that they say they need. They still don't have the notice they requested. That's because they didn't ask for it. The hard question here, and my colleague Judge Benjamin makes a very good point, and that is that there's a statutory provision here. And then the question becomes, does informational injury and does statutory injury suffice to produce concrete Article 3 injury? And that's a hard question. And yes, there are differences between the two cases, between Texas and this case, but there are also a great many similarities. And the question is, do the similarities outweigh the differences? Your Honor, I'd also like to point out that the information the states say they continue to lack is the breakdown of employees terminated by agency and by geographical location. The states have actually provided to the court a breakdown of the employees terminated by agency. That's at J.A. 690. The district court found that the states obviously have the notice that they need. That's the district court's word at J.A. 934. And the states haven't even tried to tie any distinct injuries that they say they suffered to the lack of a geographical breakdown. I'd also like to speak to my friend's statement that the ball is in the federal government's court to act. It's respectfully not. We can't give risk notice because we don't think we've conducted a risk. The SRA does not deprive federal courts of jurisdiction. And let's just say that it's an implied, to read it as an implied withdrawal of jurisdiction. It seems to me we might be going on thin ice. But does it nonetheless have relevance to the remedial phase of the case, the connection between violation and remedy and to the addressability of standing? Sure, Your Honor. I'd like to speak to both parts of that question. First, I don't think the court is remotely on thin ice in concluding that the CSRA implicitly precludes claims that it doesn't permit to be brought. The Supreme Court has said that twice in Fausto and Elgin. Those decisions written by Justice Scalia and Justice Thomas know mean textualists themselves. And this court has recognized that as well in the NTEU, the FLRA decision that we cited in our reply brief, which recognizes implied CSRA seclusion of claims by probationary employees. That's why we don't see probationary employees in this case. Because their claims are channeled through the MSPB process. And Congress intentionally gave them very limited appeal rights. As for the redressability point, Your Honor, we do think the remedies the states are requesting are very important in this case. Because they're remedies that are classically within the MSPB's jurisdiction in challenges to the legality of employment actions. If I could point the court to Elgin at page 22. The Supreme Court said the challenge to removal is precisely the type of personnel action adjudicated by the MSPB within the CSRA scheme. Likewise, reinstatement, back pay, and attorney's fees. The requests that the states make for relief here are precisely the kind of relief that the CSRA empowers the MSPB and the Federal Circuit to provide. We don't think the court is at all on thin ice in concluding that the states' claims are subject to CSRA channeling. And that the district court lacks jurisdiction as a result. I have a question regarding your, because I keep hearing this argument regarding this is not a risk. My understanding is you all are asking, your actions are a result of the executive order of the President on February the 11th. Is that correct? My understanding, Your Honor, is that the states, excuse me, the agency's position is that they conducted a review of their probationary employees. And elected to retain the probationary employees who were the highest performers in the most critical areas. And to terminate probationary employees who they determined they did not want to continue employing. Pursuant to the executive order. There was, there was OPM guidance that asked agencies to take these actions. And they cleared the agency for it. Pursuant to the executive order. Prompted by the executive order. It is section B.C. of the executive order of the President on February the 11th. That was published on February the 14th. It calls it a risk. It's reduction in force. And then it goes on to use the acronym risk. Your Honor, there have been executive orders calling for risks. Agencies, including agencies involved in this litigation, have announced and conducted risks. So it's not that the federal government or even these specific agencies are afraid to conduct risks. It's just that this was not a risk. These agencies did not conduct risks. They haven't eliminated positions. And there's been not a shred of evidence that agencies, through the terminations of probationary employees that are challenged here, have eliminated a single position or changed their agency functions. Which would be the calling cards of a risk. Part of me thinks that the voters may be the ones to render a final verdict on this. There are limits to what the courts can do. But there are also gigantic political costs to throwing out so many employees. And in one sense, the final verdict may be one for the voters to render. I'm not saying that's the whole answer. But maybe it's a part of it. I appreciate that point, Your Honor. And would agree that there are limits to what federal courts can do, including limits imposed by Article III standing requirements and by Congress's channeling of exclusive jurisdiction over challenges to federal employment matters through the MSPB and federal circuit and the CFRA process. Can I ask you just one, Judge Benjamin asked us about the merits question. In one of the amicus briefs, I think it was filed after the reply, so the parties haven't had a chance to respond to it. They claim that the acting special counsel, who I think is supposed to be pursuing these or addressing these claims, has concluded that the firings were not personal decisions about the employees, but were related to a reduction in force. Is that accurate? What role does that person play? I wanted to hear the government's response to that. Sure. So my understanding is that the Office of Special Counsel has not concluded that the terminations were risks. My understanding is that the Office of Special Counsel has sent preliminary closure letters in some cases brought by or some complaints filed by probationary employees, but that it has not publicized conclusions in any cases and that it hasn't closed cases. In addition, some terminated probationary employees have filed complaints directly with the MSPB and those complaints are also ongoing at this point. So where did the amici get this idea? I believe that the reports that they're quoting are quoting the preliminary closure letters that some people who have filed complaints have received. And those aren't final decisions? Is that what you're saying? That's my understanding, Your Honor. Thank you, Your Honor. We ask you to reverse. Thank you. Ms. Welch and Ms. Zeal, I want to thank both of you. I think you've rendered a remarkable service to the court and really what you've said is very edifying and the effort that you've put into it is very apparent. So on behalf of the court, I know my two colleagues join me in thanking you. We'd like to come down and shake your hands. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Allison J. Rushing, DeAndrea Gist Benjamin